# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

BLACK WARRIOR RIVERKEEPER
INC., *ET AL.*,

    Plaintiffs,

v.

U.S. ARMY CORPS OF
ENGINEERS, *ET AL.*,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)

2:17-cv-00439-LSC

## Memorandum of Opinion

Before the Court are Plaintiffs', Black Warrior Riverkeeper Inc. ("Riverkeeper") and Defenders of Wildlife ("DOW"), (collectively "Plaintiffs") motion for summary judgment (doc. 32), and Defendants', U.S. Army Corps of Engineers ("Corps"); Lt. General Todd T. Semonite ("Semonite"), in his official capacity as the Corps's Commanding General and Chief of Engineers; Col. James Delapp ("Delapp"), in his official capacity as Commander and District Engineer of

the Corps's Mobile District office; the U.S. Fish and Wildlife Service ("FWS");[1]

Ryan Zinke ("Zinke"), in his official capacity as Secretary of the United States

Department of the Interior; and Greg Sheehan, in his official capacity as FWS's

Acting Director, and Jim Kurth, in his official capacity as acting director of the

FWS (collectively, "Defendants"), cross motion for summary judgment (doc. 33).

For the reasons stated below, Plaintiffs' motion (doc. 32) is due to be denied and

the Defendants' cross motion (doc. 33) is due to be granted.

I.    BACKGROUND[2]

In November 2014, an entity acting on behalf of Black Warrior Minerals, Inc.

("BWM") submitted a request to the Corps to make a jurisdictional determination

to allow BWM to expand its mining operations in Jefferson County, Alabama in the

---

[1]    Plaintiffs acknowledge in their response brief that they "do not assert any claims against" FWS (Doc. 42 at 1 n.1.) Accordingly, FWS is dismissed from this action.

[2]    The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994). The Court is not required to identify unreferenced evidence supporting a party's position. As such, review is limited to exhibits and specific portions of the exhibits specifically cites by the parties. *See Chavez v. Sec'y, Fla. Dept. of Corr.,* 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record . . . .") (internal quotes omitted).

Locust Fork Watershed. The proposed project was the BWM Mine #2, a 1293-acre surface coal mine within the Lower and Middle Locust Fork watershed.[3] The Corps approved of the boundaries and began the process of reviewing the proposed action of granting a discharge permit under § 404 of the Clean Water Act ("CWA").[4] To comply with requirements of the CWA and the National Environmental Policy Act ("NEPA"),[5] the Corps examined potential cumulative impacts and multiple mitigation measures to determine whether the project could lead to significant impacts on the environment.

In crafting a baseline, the Corps determined that active surface mining operations, comprising seventeen (17) active surface coal mines, including BWM

---

[3]      Contiguous with BWM Mine #2 is the pre-existing BWM Mine #1 site. The two mines also share a state-issued National Pollutant Discharge Elimination System ("NPDES") permit. However, they do not share a permit under Clean Water Act ("CWA") § 404 or the Surface Mining Control and Reclamation Act ("SMCRA").

[4]      The CWA, 33 U.S.C. §§ 1251-1387 *et seq.*, establishes a national comprehensive program designed to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Section 404 of the CWA authorizes the Secretary of the Army, acting through the Corps, to regulate discharges of dredged and fill material into wetlands through the issuance of permits. 33 U.S.C. § 1344.

[5]      When Congress enacted NEPA, it aimed to ensure that agencies take a "hard look at environmental consequences" and "provide for broad dissemination of relevant environmental information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (internal citations and quotation marks omitted).

Mine #1, already made up 1.603% of the total acreage in the Middle Lower and Middle Locust Fork watersheds authorized and regulated by the Surface Mining Commission and Regulation Act ("SMCRA"), which is administered by the **Alabama Surface Mining Commission ("ASMC")**. Authorizing Mine #2 would amount to an additional 0.003% of the land within the watersheds. The Corps also acknowledged the decades of mining that had occurred in the Locust Fork **watershed prior to the SMCRA's passage, and it used the impacts of those** abandoned mines for baseline water quality and aquatic habitat values in the watershed. Though acknowledging various environmental harms from the past mining projects, the Corps also found that the watershed remains heavily forested[6] and provides a functioning ecosystem.

The Corps also considered how the permittee would be required to employ compensatory mitigation measures to offset the environmental impacts that could result. To begin, project applicants are already required to use Best Management Practices imposed by the Alabama Department of Environmental Management

---

[6]    The Corps noted that while the "project would temporarily eliminate forested land," *see* Corps Administrative Record ("Corps AR") 3616, "the entire site is not typically denuded of all vegetation at one time, so the forested cover can remain at somewhat constant levels. As sites are being actively mined, other sites are being actively reclaimed." *Id.* at 3623.

("ADEM"), employing water treatment processes prior to discharge of water from the mining site. The permit would also require compensatory mitigation by the permittee, such as taking measures that would enhance and preserve natural buffers along the southern boundary of the proposed mine. In light of these required mitigation measures, along with the relatively small cumulative impact that the Corps believed the BWM Mine #2 represented, it was concluded that the proposed mine would not lead to a significant impact on the environment. For this reason, Defendants elected to issue the CWA § 404 permit and to forgo making an Environmental Impact Statement ("EIS").

In addition to considering the project's potential impacts on the environment, the Corps also considered whether the project might affect listed species or their critical habitats under the Endangered Species Act ("ESA").[7] Reasoning that areas with known listed species were too distant from the mining site to be affected, the Corps defined the relevant action area to encompass only the

---

[7] "The purposes [of the ESA] are to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered **species and threatened species** . . . ." 16 U.S.C. § 1531(b).

mining site itself. Noting, among other things, that the mining site has "no continuous flowing water," Corps AR 1232,[8] the Corps then concluded that there were no listed species or critical habitats within the action area that could be affected. Having found that no effects upon listed species could result, the Corps chose not to consult with the FWS about its issuance of the CWA § 404 permit.

Based on the Corps's issuance of the CWA § 404 permit, Plaintiffs brought suit to challenge the procedures employed. Plaintiffs claimed that the Corps's conclusions were arbitrary and capricious, in violation of the Administrative Procedures Act ("APA").[9] More specifically, Plaintiffs brought claims under the ESA, the CWA, and the NEPA.

With respect to the ESA claim, Plaintiffs added that claim when they amended their complaint on May 23, 2017. Plaintiffs had mailed written notice to both the Corps and the Secretary of the Interior ("the Secretary") on March 21, 2017. The Corps received that written notice on March 24th, and the Secretary

---

[8] The Corps accepted the determinations made in the "Biological Habitat Assessment" conducted by a consultant who was hired by the permit applicant.

[9] Where an action is brought pursuant to the APA, "[t]he focal point for judicial review of an administrative agency's action should be the administrative record." *P.E.A.C.H., Inc. v. U.S. Army Corps of Engineers*, 87 F.3d 1242, 1246 (11th Cir. 1996) (citing *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985)).

received it on March 27th via first class mail. Ultimately, Plaintiffs added their ESA claim 60 days after the Corps had received notice but only 57 days after the Secretary received it.

## II.    STANDARD

In reviewing agency action, the court may set aside the action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act. This is an "exceedingly deferential" standard, *Fund for Animals v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996), such that a court's role is only "to ensure that the agency came to a rational conclusion, not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1360 (11th Cir. 2008) (citation and internal quotation marks omitted). Agency action may be set aside only "for substantial procedural or substantive reasons as mandated by statute, not simply because the court is unhappy with the result reached." *Citizens for Smart Growth v. Sec'y of the Dep't of Transp.*, 669 F.3d 1203, 1210 (11th Cir. 2012) (quoting *Fund for Animals*, 85 F.3d at 541-42); *see also Nat. Res. Def. Council v. Nat'l Park Serv.*, 250 F. Supp. 3d 1260, 1283 (M.D. Fla. 2017) (noting "[t]his standard of review provides a court with the

least latitude in finding grounds for reversal"). Particular deference is due when an agency "is making predictions, within its area of special expertise, at the frontiers of science," and thus a "court must generally be at its most deferential" in such instances. *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1248-49 (11th Cir. 2012) (citation omitted). As long as the record supports the agency's decision, that decision should be upheld even if the record could support alternative findings. *Ark. v. Okla.*, 503 U.S. 91, 112–13 (1992). However, the "failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct," and "courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Simmons v. Block*, 782 F.2d 1545, 1549–1550 (11th Cir. 1986) (citations omitted) (affirming decision to set aside agency action as arbitrary and capricious where agency "followed neither course of action specified in the regulations"). The party challenging the agency action bears the burden of proof. *See, e.g., Nat. Res. Def. Council*, 250 F. Supp. 3d at 1283 (citing *Druid Hills Civic Ass'n v. Fed. Highway Admin.*, 772 F.2d 700, 709 n.9 (11th Cir. 1985)).

III.   DISCUSSION

A. **Plaintiffs'** *ESA Claim*

As an initial matter, there is a question as to whether Plaintiffs followed the proper procedure in adding their claim under the ESA. A citizen may not commence an action under the ESA "prior to sixty days after written notice . . . has been given" to the Secretary of the Interior "and to any alleged violator." 16 U.S.C. § 1540(g)(2)(A)(i) (2012). Courts have interpreted this provision strictly to ensure that all parties have "an opportunity to resolve the dispute and take any necessary corrective measures before a resort to the courts." *Waterkeeper Alliance v. U.S. Dep't of Def.*, 271 F.3d 21, 29 (1st Cir. 2001); *see S.W. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir. 1998) ("A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA."); s*ee also Nat'l Parks & Conservation Ass'n Inc. v. TVA*, 502 F.3d 1316, 1329 (11th Cir. 2007) (discussing a similar notice provision under the CWA). The "requirement is jurisdictional,"[10] and non-compliance warrants dismissal of the case. *Alabama v. U.S. Army Corps of Eng'rs*, 441 F. Supp.

---

[10] Though the Eleventh Circuit has issued a decision regarding the jurisdictional aspect of the notice requirement of the ESA, the parties agree on this point. "Plaintiffs agree" with Defendants that "compliance with the ESA's 60 day notice requirement is mandatory and jurisdictional." (*See* Doc. 42 at 6.)

2d 1123, 1129 (N.D. Ala. 2006) (citing *Sw. Ctr. for Biological Diversity*, 143 F.3d at

520 and *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1072 (9th Cir. 1996)); *see also*

*Save the Yaak Comm. v. Block*, 840 F.2d 714, 721 (9th Cir. 1988) ("[The ESA's]

notice requirement is jurisdictional . . . .").[11]

The parties do not dispute any of the facts regarding **Plaintiffs'** attempt to

provide written notice of intent, but there remains a legal question as to when the

60-day notice period begins where a plaintiff sends notice through the mail. If the

notice period began on the postmark date, then **Plaintiffs'** filing of the amended

complaint 63 days after mailing notice would be sufficient. But if the notice period

began upon receipt by all parties, then the fact that Plaintiffs filed their amended

complaint only 57 days after the Secretary received notice would warrant dismissal

without prejudice of the ESA claim.

The starting point of the required notice period presents a novel issue. It is

well established that the notice requirements in the ESA and in similar laws are

---

[11]     A number of district courts within this Circuit have found the 60-day notice requirement
of the ESA to be jurisdictional. *See e.g. Birdsong v. City of Birmingham*, 2014 WL 4825247 (N.D.
Ala. Sept. 26, 2014); *Defenders of Wildlife v. Bureau of Ocean Energy Mgmt., Regulation, and
Enforcement*, 791 F. Supp. 2d 1158, 1181 (S.D. Ala. 2011)(citing *Pulaski v. Chrisman*, 352
F.Supp.2d 1105, 1115–16 (C. D. Cal. 2005) and *Conservation Force v. Salazar*, 715 F.Supp.2d 99,
102 (D.D.C. 2010) (declaring that 60-day notice requirement under ESA is "mandatory and
jurisdictional") (citations omitted).

quite strict. *See e.g., Hallstrom v. Tillamook Cty.*, 493 U.S. 20, 27 (1989). The case most analogous to the facts at issue is *Center for Environmental Science, Accuracy & Reliability v. Sacramento Regional County Sanitation Dist.*, No. 1:15-cv-01103 LJO BAM, 2016 WL 8730775 (E.D. Cal. June 3, 2016) ("*CESAR*"). There, a district court dismissed an ESA claim when a plaintiff had mailed written notice to the Secretary, but the notice had never reached the Secretary. *Id.* (noting that "it is not unfair to require that an ESA notice be 'received'"). However, unlike in *CESAR*, the Secretary did ultimately receive notice here. Indeed, neither party has been able to cite any case that addresses a situation in which a plaintiff filed a citizen-suit complaint more than 60 days after mailing notice but fewer than 60 days after the receipt of that notice.

Plaintiffs point to similar notice-requirement language in the CWA, *see* 40 C.F.R. § 254.2(c), from which the ESA's notice provision was patterned. *Hallstrom*, 493 U.S. at 23 n.1. Because the Environmental Protection Agency ("EPA") regulations have interpreted the CWA's notice period as beginning on the postmark date, Plaintiffs claim that the same should apply to the ESA. *See* 40 C.F.R. § 54.2(d) ("Notice served in accordance with the provisions of this part shall be deemed given on the postmark date, if served by mail, or on the date of

receipt, if personally served.");[12] *see also, e.g.,* 40. C.F.R. § 135.2(c). However, the ESA is administered by a different agency—the Fish and Wildlife Service—which is not bound by the interpretations made by the EPA. *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 293 n.4 (1988) (noting that "agency regulations may give a varying interpretation of the same phrase when that phrase appears in different statutes and different statutory contexts"). Moreover, the case cited by Plaintiffs in support is distinguishable. In *Loggerhead Turtle v. Volusia County, Florida,* the Eleventh Circuit confined its analysis exclusively to the attorney fee language in the ESA and CWA, making no comparison of the notice-requirement provision. 307 F.3d 1318, 1325 (11th Cir. 2002).

With no precedent as to when the notice period begins under the ESA, this Court instead looks to the **provision's language**[13] and purpose. The question of **when notice has "been given"** is admittedly an unclear one. Common usage could hold either way as to whether the act of giving alone is enough or whether receipt is

---

[12] The CWA requires notice be **given via "certified mail."** 40 C.F.R. § 54.2(a), (b). Plaintiffs notice to the Secretary here indicates that it was delivered via first class mail and would thus be deficient for that additional reason. (*See* Doc. 41-1 at 5.)

[13] "The threshold question in ascertaining the correct interpretation of a statute is whether the **language of the statute is clear or arguably ambiguous."** *See K Mart Corp.,* 486 U.S. at 293 n.4.

necessary. *See Give*, BLACK'S LAW DICTIONARY (11th ed. 2014) ("to present to another to consider"). Fortunately, the Supreme Court provided guidance in *Hallstrom*, noting that the 60-day notice period provides agencies with opportunity to take corrective measures and thereby make litigation via citizen suits unnecessary. 493 U.S. at 29; *see also Sw. Ctr. for Biological Diversity*, 143 F.3d at 520 (the ESA's notice requirement provides agencies with "an opportunity for settlement or other resolution of a dispute without litigation") (quoting *Forest Conservation Council v. Espy*, 835 F. Supp. 1202, 1210 (D. Id. 1993) *aff'd*, 42 F.3d 1399 (9th Cir. 1994)). Thus, the purpose of the 60-days' notice is to provide the parties with a window to correct the issues and avoid costly litigation.

Given the notice provision's purpose, it would seem necessary for the notice period to begin only once the parties[14] have received notice of the intent to sue. Suppose that Plaintiffs had mailed its notice of intent just as occurred here, but the delay in receipt was even more pronounced. Under Plaintiffs' reading of the

---

[14]     Plaintiffs' alternate argument that the 60 day notice period began to run on the date that the Corps, as the party against whom the ESA claims were asserted, received notice is likewise unavailing. The notice requirement contained in the ESA is unequivocally conjunctive, requiring that notice be given to "the Secretary, *and* to any alleged violator" at least 60 days prior to filing suit. 16 U.S.C. § 1540(g)(2)(A)(i) (emphasis added). *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means what it says there.").

statute, it could have met its notice requirement even if the Corps or the Secretary had not received the written notice until 59 days after the postmark date. Such a **short period between receipt of notice and the action's commencement** would be wholly inadequate for the parties to resolve the claim without resorting to litigation.

Moreover, Plaintiffs can hardly claim that requiring a plaintiff to ascertain when notice has been received is an undue burden. As Plaintiffs, Riverkeeper and DOW, have **"full control o**ver the timing of [their] **suit."** *Hallstrom*, 493 U.S. at 27. No great obstacle prevented Plaintiffs from making inquiries into when the Secretary had received notice and then delaying the filing of the amended complaint accordingly. Indeed, Plaintiffs filed their amended complaint on May 23, 2016, exactly 60 days after the Corps received notice and 63 days after Plaintiffs alleges they gave notice. That fact is strong evidence of **Plaintiffs'** ability to delay the filing of their suit to an appropriate time. Because the controversy here resulted from **Plaintiffs'** decision of when to file the **amended complaint, the "equities do not weigh in favor"** of interpreting the procedural requirement in **Plaintiffs'** favor. *See id.*

Plaintiffs argue that the timing of receipt by the Secretary is not fatal, since the Corps received notice on time and the Secretary did ultimately receive notice as

well.  But, the text of § 1540(g)(2)(A)(i) makes clear that notice must be given to *both* the Secretary and the agency that is in violation of the law.[15]  And in *CESAR*, failure to notify the Secretary 60 days prior to commencing the action was just as fatal to the claim as a failure to notify the agency alleged to be in violation.  2016 WL 8730775, at *5.  Between the statutory text and subsequent case law, the ESA requires that the Secretary be included in the lead-up to litigation in the same manner as the agency alleged to be in the wrong.  Thus, Plaintiffs cannot excuse any deficiency in their notice to the Secretary by arguing that the notice to the Corps was sufficient.

By filing their amended complaint fewer than sixty days after receipt of notice by both the Corps and the Secretary, Plaintiffs have failed to provide

---

[15]     As the Court in *Hallstrom* noted when holding that the notice and 60-day delay requirements were a mandatory condition precedent to commencing suit under the RCRA citizen suit provision, "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Hallstrom*, 493 U.S. at 31 (quoting *Mohasco Corp. v. Silver*, 447 U.S. 807, 826 (1980) (internal quotation marks omitted)).

sufficient notice as required under § 1540(g)(2)(A). Their citizen suit claim under the ESA is therefore due to be dismissed without prejudice.[16]

Because the Court has determined that *Plaintiffs'* ESA claim is due to be dismissed without prejudice for failure to give *60 days' notice of intent,* a requirement that is jurisdictional,[17] the Court declines to proceed to its merits.

### B. *Plaintiffs'* CWA and NEPA claims

In addition to claims under the ESA, Plaintiffs also bring claims under both the CWA and the NEPA. To succeed on either claim, Plaintiffs must first show that *Defendants'* actions were arbitrary and capricious.[18]    *See Black Warrior*

---

[16]    Plaintiffs also point to the fact that the parties mutually agreed to the date upon which Plaintiffs filed the amended complaint. However, this implicit argument of waiver finds no support from either the statutory language or case law interpreting it. The text of the statute is phrased as an absolute. *See* 16 U.S.C. § 1540(g)(2)(A)(i) ("No action may be commenced . . . prior to sixty days after notice has been given . . . ."). No exception for waiver appears within the text. Furthermore, Plaintiffs fail to cite any case authority that discusses a waiver of notice.

[17]    "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *In re Bayou Shores SNF, LLC,* 828 F.3d 1297, 1329 (11th Cir. 2016) (citing *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle,* 74 U.S. 506, 514 (1868))).

[18]    "The arbitrary and capricious standard is a highly deferential one, and [a court] cannot substitute [its] judgment for that of the agency as long as the agency's conclusions are rational and reasonably explained." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Eng'rs,* 833 F.3d 1274, 1285 (11th Cir. 2016) (citing *Sierra Club,* 526 F.3d at 1360)). "[A court's] inquiry is limited

*Riverkeeper, Inc.*, 833 F.3d at 1286-89 (holding that agency's finding of minimal effects in issuing CWA permit was not arbitrary and capricious); *see also Hill v. Boy*, 144 F.3d 1446 (11th Cir. 1998) (reviewing decision not to issue EIS under "arbitrary and capricious" standard).

The CWA prohibits the discharge of pollutants, such as dredge or fill material, into any navigable waters unless authorized by a CWA permit. 33 U.S.C. § 1311(a) (2012). Section 404 of the CWA authorizes the Corps to regulate the discharge of dredge and fill materials into wetlands through the issuance of permits. 33 U.S.C. § 1344 (2012). Before issuing a permit under CWA § 404, the Corps must ensure that the potential discharges could not have "significantly adverse effects" on human health or welfare, aquatic life, or aquatic ecosystems. 40 C.F.R. § 230.10(c)(1)–(3). In doing so, the Corps must make a written determination as to the potential effects of the proposed discharge "on the physical, chemical, and biological components of the aquatic environment." 40 C.F.R. § 230.11.

---

by law to whether the agency's decision was based on a consideration of the relevant factors and, ultimately, whether it made a clear error of judgment." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 541 (11th Cir. 1996).

Unlike the CWA, the NEPA sets no substantive restrictions on agency actions. *Sierra Club*, 526 F.3d at 1361 ("NEPA is procedural, setting forth no substantive limits on agency action." (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)). Instead, the NEPA directs federal agencies to carefully consider the environmental consequences for their actions and to prepare an EIS for any "major Federal action significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). In determining whether there are significant impacts, an agency must also analyze the cumulative impacts of a proposed action in the context of other, related actions. *See City of Oxford v. FAA*, 428 F.3d 1346, 1353 n. 16 (11th Cir. 2005).[19] A cumulative impact is the impact on

---

[19] "The NEPA regulations provide:

'Significantly' as used in NEPA requires considerations of both context and intensity:
. . .
(b) [Intensity. This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action.] The following should be used in evaluating intensity:
. . .
(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. [Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.]"

the environment that results when the project's effects are "added to other past, present, and reasonably foreseeable future actions" that may occur. 40 C.F.R. § 1508.7.[20] After examining all potential impacts from the project, an agency may forgo issuing an EIS and instead issue a "finding of no significant impact" ("FONSI") if it provides a detailed and convincing statement of its reasoning. 40 C.F.R. §§ 1501.4(b), 1508.13.[21]

The Eleventh Circuit has cited four criteria applied by courts in the District of Columbia when considering whether an agency's decision not to prepare an EIS is arbitrary and capricious.

---

*Id.* n. 16 (citing 40 C.F.R. § 1508.27).

[20] "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." 40 C.F.R. § 1508.7.

[21] "Finding of no significant impact means a document by a Federal agency briefly presenting the reasons why an action, not otherwise excluded (§ 1508.4), will not have a significant effect on the human environment and for which an environmental impact statement [EIS] therefore will not be prepared. It shall include the environmental assessment [EA] or a summary of it and shall note any other environmental documents related to it (§ 1501.7(a)(5)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference." 40 C.F.R. § 1508.13.

First, the agency must have accurately identified the relevant environmental concern. Second, once the agency has identified the **problem it must have taken a "hard look" at the problem in preparing** the EA. Third, if a finding of no significant impact is made, the agency must be able to make a convincing case for its finding. Last, if the agency does find an impact of true significance, preparation of an EIS can be avoided only if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum.

*Hill v. Boy,* 144 F.3d at 1450 (emphasis added) (citing *Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d 60, 66–67 (D.C. Cir. 1987) (quoting *Sierra Club v. U.S. Dep't of Transp.,* 753 F.2d 120, 127 (D.C. Cir. 1985))). The Court finds that the Corps took the requisite hard look and made a convincing case for its finding.

Common between the two claims is the contention that the Corps failed to adequately consider whether the BWM Mine #2 action might have significant impacts upon the environment. On that alleged failure, Plaintiffs argue that the Corps was arbitrary and capricious both in its awarding of a CWA § 404 permit to BWM Mine #2 and in its finding that the action would have no significant impacts on the environment. However, an examination of the administrative record reveals

that the Corps followed proper procedure, and its FONSI conclusion therefore

warrants deference.[22]

The administrative record shows that the Corps did examine the potential

impacts from the proposed mining project by conducting a cumulative impacts

analysis, taking into account the direct and indirect effects of the project over a 14-

year period. Corps AR 3611-12. Moreover, the Corps employed the cumulative

effect of mining from before that period as a "baseline condition for water quality

and aquatic habitat values in the watershed." *Id.* at 3616.[23] The analysis specifically

---

[22]     *See Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987) ("The NEPA process involves an almost endless series of judgment calls . . . . The line-drawing decisions necessitated by this fact of life are vested in the agencies, not the courts.").

[23]     In its description of the affected environment, the Corps noted:

> In general, surface coal mining and timber removal activities have occurred within the Lower Locust Fork and Middle Locust Fork watersheds for several decades. Pre-SMCRA mining activities resulted in adverse impacts to the landscape including the loss of forested areas streams and wetlands. As some of these areas were left un-reclaimed adverse impacts continue to persist, mostly in the form of poor water quality and compromised aquatic and terrestrial habitat. While most of the un-reclaimed areas have naturally revegetated and in many instances have become reforested there is still evidence of the past mining activities (refuse sites, acid mine drain seeps, spoil piles, open mine pits etc). These pre-SMCRA and pre-CWA impacts are relevant as they have set a baseline condition for water quality and aquatic habitat values within the watershed. They also provide the context for purposes of assessing the significance of impacts in our NEPA analysis.

addressed the areas in which discharges would occur. *Id.* at 3611. It further noted

the potential water quality impacts that could result. *Id.* The Corps then

considered those potential impacts in light of the compensatory mitigation required

by the permit. *Id.* at 3630. On the basis that those mitigation measures would

offset any potential harms, the Corps rationally concluded that the proposed

mining project would not have significant impacts upon the environment.[24] Unless

---

Corps AR at 3613.

[24] The administrative record further noted that :

As explained above, the Corps assesses the potential significance of cumulative impacts from the incremental impact of this proposal in the context of past unregulated mining activities Pre-SMCRA mining activities as well as other resource extraction activities most likely resulted in some cumulative impacts. However, the area has been mined for several decades therefore impacts associated with resource removal activities in most cases did not impact pristine virgin areas. Mining activities conducted in the 1980's and 1990's were not as stringently regulated as they are today, mining techniques were not necessarily environmentally friendly stream evaluation and mitigation techniques were not reliable and regulatory oversight was less vigorous. As a result, mining activities most likely resulted in some cumulative impacts to the watershed. Currently, Section 401 402 and 404 CWA requirements and SMCRA regulations are very rigorous and mining activities are more closely regulated. Some of the mining activities occurring at this time are located in areas that have been previously impacted and will be reclaimed at the completion of mining Portions of the proposed surface mine have been impacted by pre-SMCRA mining activities and logging. Although the watershed has been impacted by pre and post SMCRA mining, silviculture, and general development activities the analysis above indicates the aquatic resources within the watershed have not experienced such adverse impacts that they cannot provide the functions necessary to maintain

that conclusion was arbitrary and capricious, the Corps was within its discretion to issue the CWA § 404 permit and to forgo making an EIS for the project. Plaintiffs' arguments to the contrary are insufficient.

Plaintiffs argue that the Corps erred by relying on compensatory mitigation[25] required by the state-issued NPDES permit and not conducting an independent analysis to ensure that the § 404 permit addresses possible threats to water quality from permitted discharges. Although 40 C.F.R. § 230.10(b)(1) does reference "consideration of disposal site and dilution," it does not clearly state that a § 404

---

aquatic life and its supporting ecosystem. <u>Recent water quality and biological data has indicated the watershed is sufficiently absorbing the impacts without significant aquatic impairment and/or degradation</u>. In this case, no compelling data has been presented to indicate the aquatic resources within the watershed have experienced such adverse impacts that they cannot provide the functions necessary to maintain aquatic life and its supporting ecosystem.

Corps AR 3628-29.

[25]    The Corps "determined that the discharge of fill material into waters of the U.S. would have a neutral effect on water quality as a result of the mitigative actions, provided the applicant adheres to the terms and conditions prescribed in the Section 402 NPDES permit requirements, Section 401 water quality certification, and the ASMC permit." AR 3607; *see also* 40 C.F.R. § 320.4 (r)(1) ("(1)  Mitigation is an important aspect of the review and balancing process on many Department of the Army permit applications. Consideration of mitigation will occur throughout the permit application review process and includes avoiding, minimizing, rectifying, reducing, or compensating for resource losses. Losses will be avoided to the extent practicable. Compensation may occur on-site or at an off-site location . . . ."); *see also generally* 40 C.F.R. § 325.4 (setting out the requirements for the conditioning of permits, which includes mitigation).

permit requires *independent* consideration. The EPA guidance document cited by Plaintiffs, while clearer, specifically cabins its analysis to states in the Appalachian region, and is thus inapposite to actions taken in Alabama. *See July 21, 2011 Final Guidance on Improving EPA Review of Appalachian Surface Coal Mining Operations under the CWA, NEPA, and the Environmental Justice Executive Order*, at 1, n.1 (last visited March 29, 2018). The Court finds no cause to question the Corps's reliance on the NPDES requirements.

Plaintiffs allege that the Corps's no-significant-impact conclusion was irrational for flatly contradicting the findings of an ADEM study[26] cited within the Corps's own administrative record. However, an examination of that record reveals that the Corps accounted for the study's findings.[27] The Corps's

_____

[26] The study "focused on surface coal mining facilities in the Black Warrior River basin with permitted discharges to wadeable streams. Sample locations were established at permitted outfalls and upstream and downstream of those outfalls. Three reference stations were also included in the study. A total of eleven stream stations, three reference stations, and six permitted outfalls from treatment ponds were sampled during the period study." AR 3620.

[27] The administrative record shows that the Corps considered public interest review factors in conjunction with its 404(b)(1) guideline analysis and "utilized data and information submitted in the ASMC permits application, Alabama Soil and Water Conversation Committee, the ADEM 303(d) list, ASMC date, GIS date, OSM data, the ADEM study . . . and the Corps Regulatory Operations and Maintenance Business Information Link Regulatory Module" in assessing the cumulative, indirect and direct impacts, ultimately arriving at the conclusion that the issuance of

administrative record acknowledges the negative environmental impacts found near mine outfalls.[28] Yet, it also cites the ADEM study as indicating that there is no definitive "link between discharges from surface coal mining treatment ponds

---

the permit would have minimal environmental effects. Corps AR 3610-11; *see* 40 C.F.R. § 1500.4(k) (encouraging the integration of NEPA requirements with other environmental review and consultation requirements).

[28]    Some of the key points of the study are listed as follows:

1. Macroinvertebrate community health was generally scored as 'Poor' or 'Very Poor' at stations located near surface coal mining sites. However, the link between discharges from surface coal mining treatment ponds and macroinvertebrate community health is not definitive in this study.
2. The quality of available aquatic habitat in wadeable streams decreases as the amount of disturbed acres increases in the watershed.
3. Measurements of whole effluent chronic toxicity varied between no toxicity observed in 100% effluent to observed toxicity at an effluent concentration of 56%.
4. Concentrations of dissolved hardness-dependent metals did not exceed applicable water quality criteria.
5. Total nitrogen concentrations increased significantly ($p<0.05$) from upstream to downstream of treatment pond outfalls. This was not the case for total phosphorus where concentrations were not significantly different ($p>0.05$) from upstream to downstream. However, the increase in total nitrogen downstream of treatment pond outfalls did not appear to result in a water quality response at the downstream station, and nitrogen concentrations decreased following reclamation.
6. The concentration of nickel in stream bottom sediment at 7 stations was elevated above the concentration measured in sediment at ecoregional reference stations"
7. The concentration of total arsenic in sediment at 3 stations exceeded the concentration measured in sediment at ecoregional reference stations" . . .

Corps AR 3620-21.

and macroinvertebrate community health;"[29] and "**the water quality criterion for turbidity was not exceeded.**" Corps AR 3620, 22. The record indicates the Corps took the ADEM study into account when making its FONSI determination. Additionally, even if the administrative record could be construed as to find an impact of true significance, which the Corps **did not, the** "preparation of an EIS can be avoided" "if the agency finds that changes or safeguards in the project sufficiently reduce the impact to a minimum." *Hill v. Boy*, 144 F.3d at 1450. The safeguards provided by the mitigation practices required of the permittee are referenced throughout the administrative record and suffice for a finding that the Corps reasonably believed those safeguards would prevent any potential impacts from becoming significant.

Plaintiffs also point to the Locust Fork watershed's placement on the state's impaired waters "303(d)" list of water quality segments as evidence of the Corp's

---

[29] The administrative record earlier notes in a discussion of impacts to other wildlife, that "temporary impacts to wildlife habitat at the site during the mining operation" would result, and "less mobile species, such as macroinvertebrates in the intermittent stream, would be eliminated as a result of this project." Corps AR 3593. However, the Corps also noted that "the proposed reclamation plan, as required by ASMC, includes re-vegetation at the site and returning the area to AOC, including drainage areas. There is the potential for intermittent flow to return in the drainage areas, which could provide habitat for the macroinvertebrates. Once the area is reclaimed, it would allow wildlife to return to the area." *Id.* This provides a basis for the finding that the macroinvertebrates health was not definitive.

error in issuing the permit.[30] **40 C.F.R. 230.10 (b)(1) ("No discharge of dredged or fill material shall be permitted if it: (1) causes or contributes, after consideration of disposal site dilution and dispersion, to violations of any applicable State water quality standard.").** The administrative record shows that the Corps acknowledged **Locust Fork's categorization as impaired in light of th**e ADEM 303(d) list and that the cause for the listing was agriculture and abandoned surface mines. *See* Corps AR 3614. Noting **also that "[m]any of the pre-**SMCRA mines located in the watershed are in some stage of re-forestation and these forested areas would continue to mature, provided additional man-induced impacts do not **occur."** Corps AR 3614-15. The Corps concluded that "[s]urface water leaving the project site would be expected to meet state water quality standards as required by the

---

[30]     The quote cited by Plaintiffs from *Sierra Club, Inc. v. Leavitt*, 488 F.3d 904, 908 (11th Cir. 2007) spoke of the "significance" of a water body's being placed on the state's impaired waters list for purposes of targeting the water quality limited segments ("WQLS") for pollution control in determining that a sta**te department of environmental protection's failure to consider data** more than 7.5 years old in developing its impaired waters list pursuant to the CWA violated EPA regulations. The Court does not read this quote to mean that a new mine would automatically be deemed to **have a significant impact in an area that is already listed on a state's 303(d) list.** The *Leavitt* court explained that states decrease pollution in their WQLSs by establishing a total maximum daily load ("TMDL") for pollutants in a designated WQLS. *Id.* at 908. The Corps notes that an "ADEM has not yet developed a TMDL for Locust Fork" but the "estimated completion is in 2019 for siltation and 2016 for nutrients, according to the 2014 Final 303(d) List." **This demonstrates that the Corps** acknowledged **Locust Fork's** presence 303(d) list.

NPDES permit; [and] [t]herefore, any adverse impacts to the water quality within the **Middle and Lower Locust Fork watersheds would be expected to be minimal.**" *Id.* at 3623. As such, "[i]t [was] expected that the long terms effects on surface water quality and quantity in the receiving streams would be negligible." *Id.* at 3626. The Court finds that the administrative record as a whole does not indicate that the Corps determination of a no significant impact was arbitrary or capricious on this point.

Finally, Plaintiffs argue that the Corps irrationally failed to account for the impacts of BWM Mine #1 which is adjacent to BWM Mine #2, when conducting its CWA and NEPA analyses. This argument remains unconvincing. While Plaintiffs have submitted evidence showing that the two mines share an NPDES permit, they have not shown that they share permits under CWA § 404 or under the SMCRA.[31] Additionally, the mines have distinct ASMC permits. And regardless of whether the projects are totally distinct, BWM Mine #1 is included among the list of local

---

[31]     Even if the two mines were at times mentioned together as part of a single project, that fact alone is not dispositive. *See Stewart Park & Reserve Coal v. Slater*, 352 F.3d 545, 560 (2d Cir. 2003) (finding that two roadway projects earlier discussed as single project each had distinct purposes and were not dependent on each other for an analysis under the NEPA and various state laws in New York).

area mines the Corps considered as part of its cumulative impacts analysis. *See* Corps AR 3432-47. Overall, Plaintiffs have failed to meet their burden of showing that the Corps acted arbitrarily and capriciously in granting a CWA § 404 permit and in forgoing an EIS under the NEPA.

Under the deferential standard[32] this Court is bound to apply, the Court does not find that the administrative record clearly warrants a finding of arbitrary or capricious action on behalf of the Corps or any other Defendant. Thus, with respect to the CWA and NEPA claims, **Plaintiffs'** motion is due to be denied, and the **Defendants'** cross motion is due to be granted.

## IV.   CONCLUSION

**For the reasons stated above, Plaintiffs'** motion for summary judgment (doc. 32) is due to be **denied and Defendants'** cross motion for summary judgment (doc. 33) is due to be granted. An order consistent with this Memorandum of Opinion will be entered contemporaneously herewith.

---

[32]    "This standard requires substantial deference to the agency, not only when reviewing decisions like what evidence to find credible and whether to issue a FONSI or EIS, but also when reviewing drafting decisions like how much discussion to include on each topic, and how much data is necessary to fully address each issue." *Sierra Club*, 526 F.3d at 1361.

DONE and ORDERED on August 14, 2018.

_____
L. Scott Coogler
United States District Judge

190685